# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51276-9-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ROBERT LEIGH LEATHERMAN, | |
| Appellant. | |

MAXA, C.J. – Robert Leatherman appeals his convictions for first degree animal cruelty and bail jumping and the trial court's imposition of a criminal filing fee as a mandatory legal financial obligation (LFO). The State filed the animal cruelty charge after a necropsy of Leatherman's dog "Wolfy" revealed signs of starvation and neglect.

We hold that (1) Leatherman's defense counsel did not provide ineffective assistance by failing to request an inferior degree offense instruction regarding second degree animal cruelty or by failing to object to the admission of medical evidence, (2) Leatherman's prosecutorial misconduct claims fail because one challenged statement was not improper and one claim was waived because he did not object, (3) Leatherman's unpreserved challenge to the to-convict instruction for bail jumping does not involve a manifest constitutional error and therefore does not merit our review under RAP 2.5(a)(3), and (4) the criminal filing fee imposed on Leatherman at sentencing must be stricken based on Leatherman's indigence.

Accordingly, we affirm Leatherman's convictions for first degree animal cruelty and bail jumping, but we remand for the trial court to strike the criminal filing fee from the judgment and sentence.

FACTS

*Background*

Leatherman owned a large, elderly dog named "Wolfy." Leatherman lived in the small Thurston County town of Bucoda, where Wolfy was well-known because he wandered around town almost every day.

In October 2014, Shawna Estrada saw Wolfy limping down the road while she was driving through Bucoda. Estrada thought that Wolfy looked injured and noticed that he was missing skin from his hindquarters and that he emitted a strong odor. He also was missing a lot of hair, his hips appeared injured, and there were maggots in the numerous sores on his skin. Estrada took pictures of Wolfy, later posting them on the local newspaper's social media page in an attempt to get Wolfy some help.

Shortly thereafter, Leatherman decided it was time to put Wolfy down because Wolfy began having seizures. A friend of Leatherman's drove Wolfy out of town and shot him in the head. The body was left there.

On October 14, the Thurston County Sheriff's Office received a report about a dog shooting in Bucoda. Deputy Jay Swanson investigated and talked with Leatherman. Leatherman told him that Wolfy had been put down the previous day. Swanson subsequently located Wolfy's remains.

Dr. Victoria Smith, a veterinarian, performed a necropsy on Wolfy a few days later. Based on her findings, the State charged Leatherman with first degree animal cruelty, alleging

that he had starved Wolfy in a manner that caused substantial and unjustifiable pain in violation of RCW 16.52.205(2)(a). The State amended the information to include bail jumping after Leatherman did not appear for a pretrial hearing that the trial court previously had ordered him to attend.

*Trial Testimony*

Dr. Smith testified at trial that her necropsy of Wolfy revealed extensive hair loss, alopecia (a skin condition), advanced dental disease, and significant loss of muscle and subcutaneous fat. She also found arthritis, old gunshot wounds, and severe chronic ear infections. The only contents of Wolfy's stomach were rocks, corn, and hair, and Dr. Smith testified that dogs typically do not eat rocks unless they are starving.

Dr. Smith testified that Wolfy's advanced periodontal disease was accompanied by hair wrapped around many of his teeth, causing abrasions, swelling, and pus in his gum line. The hair around Wolfy's teeth was likely evidence that he chronically chewed his coat. Such chewing typically occurs when a dog is injured or in pain from either a skin or orthopedic condition.

Dr. Smith concluded that the state of Wolfy's mouth and teeth would have made it very difficult for him to eat. She also concluded that the totality of Wolfy's health conditions would have meant that he was in pain for at least the last six months of his life.

Leatherman presented testimony from several Bucoda residents who were familiar with Wolfy. These witnesses testified that the last time they had seen Wolfy he had appeared to be old but in good condition. They also testified that Leatherman took good care of Wolfy and that he left bowls of food and water out for him. Although Wolfy's breath was bad, it was the kind of

bad breath typical of an old dog. One witness testified that Leatherman was fond of Wolfy and was very sad when it was time to put him down.

*Jury Instructions and Closing Arguments*

The trial court instructed the jury on first degree animal cruelty. Defense counsel did not propose an inferior degree offense instruction regarding second degree animal cruelty.

The trial court gave a to-convict instruction on bail jumping that did not provide that the State had the burden of proving that Leatherman failed to appear in court "as required." Leatherman did not object to this instruction.

The State's theory at closing was that Leatherman had starved Wolfy by negligently failing to treat his advanced periodontal disease, to the point that Wolfy was unable to eat because of the extreme pain he would have experienced while attempting to chew his food. Regarding reasonable doubt, the prosecutor stated that the jury should ask whether any doubt they had was a reasonable one.

Defense counsel argued in closing that Wolfy was Leatherman's beloved companion and that "if somebody has that kind of camaraderie, it's highly unlikely that they are going to engage in the type of criminal negligence that would lead for the dog to starve." 2 RP at 329. Defense counsel further argued that Leatherman had been very upset about Wolfy's death, showing "an established relationship between . . . the dog Wolfy and Mr. Leatherman." 2 RP at 331.

In rebuttal, the prosecutor compared caring for a dog with caring for a human child. Leatherman did not object to this argument.

The jury convicted Leatherman of first degree animal cruelty and bail jumping. The trial court imposed a $200 criminal filing fee as a mandatory LFO. Leatherman appeals his convictions and the imposition of the criminal filing fee.

4

ANALYSIS

A.     INEFFECTIVE ASSISTANCE OF COUNSEL

Leatherman argues that he received ineffective assistance of counsel at trial because defense counsel (1) failed to request an inferior degree offense jury instruction for second degree animal cruelty, and (2) failed to object to Dr. Smith's testimony regarding Wolfy's untreated health problems not directly related to his starvation. We disagree.

1.     Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). We review ineffective assistance of counsel claims de novo. *Id.*

To prevail on an ineffective assistance of counsel claim, the defendant must show both that (1) defense counsel's representation was deficient, and (2) the deficient representation prejudiced the defendant. *Id.* at 457-58. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id.* at 458. Prejudice exists if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed. *Id.* Reasonable probability in this context means a probability sufficient to undermine confidence in the outcome. *Id.*

We begin our analysis with a strong presumption that defense counsel's performance was reasonable. *Id.* Defense counsel's conduct is not deficient if it can be characterized as legitimate trial strategy or tactics. *Id.* To rebut the strong presumption that counsel's performance was effective, "the defendant bears the burden of establishing the absence of any 'conceivable

legitimate tactic explaining counsel's performance.' " *State v. Grier*, 171 Wn.2d 17, 42, 246

P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

2.    Failure to Request an Inferior Degree Offense Instruction

Leatherman argues that the failure to request an inferior degree offense instruction for

second degree animal cruelty constituted ineffective assistance.  He claims that defense counsel's

"all or nothing" strategy was not reasonable because it forced the jury to either convict him of

first degree animal cruelty or allow him to go free despite evidence that he had failed to get

necessary veterinary care for Wolfy.  We disagree.

a.    Entitlement to Instruction

RCW 10.61.003 provides that a jury may find a defendant not guilty of the charged

offense but guilty of an offense with an inferior degree.  Under this statute, both parties have a

statutory right to an inferior degree offense instruction.  *See State v. Corey*, 181 Wn. App. 272,

277, 280, 325 P.3d 250 (2014).  The party requesting an instruction on an inferior degree offense

must show:

> (1) the statutes for both the charged offense and the proposed inferior degree offense
> proscribe but one offense; (2) the information charges an offense that is divided into
> degrees, and the proposed offense is an inferior degree of the charged offense; and (3)
> there is evidence that the defendant committed only the inferior offense.

*State v. Fernandez-Medina*, 141 Wn.2d 448, 454, 6 P.3d 1150 (2000) (quoting *State v. Peterson*,

133 Wn.2d 885, 891, 948 P.2d 381 (1997)) (internal quotation marks omitted).[1]

---

[1] The parties apply the test for giving a *lesser included* offense instruction.  However, second degree animal cruelty is an inferior degree of first degree animal cruelty, not a lesser included offense.  The Supreme Court has emphasized that the analysis for an inferior degree offense instruction is different than the analysis for a lesser included offense instruction.  *Fernandez–Medina*, 141 Wn.2d at 454.

The third requirement is the factual component of the test. An inferior degree offense instruction must be given if the evidence would permit a jury rationally to convict *only* on the inferior offense and acquit on the greater offense. *Fernandez–Medina*, 141 Wn.2d at 456.

The issue regarding Leatherman's entitlement to an instruction is whether the factual component was satisfied. First degree animal cruelty, as charged in this case, required proof that the defendant "with criminal negligence, did starve an animal and as a result caused substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering." Clerk's Papers (CP) at 24; *see* RCW 16.52.205(2). Second degree animal cruelty occurs when, "under circumstances not amounting to first degree animal cruelty, the owner knowingly, recklessly, or with criminal negligence . . . [f]ails to provide the animal with necessary . . . medical attention and the animal suffers unnecessary or unjustifiable physical pain as a result of the failure." RCW 16.52.207(2)(a).

Here, the evidence would support a finding that Leatherman failed to provide Wolfy with necessary medical attention and thereby caused physical pain, but that he did not with criminal negligence starve Wolfy. In other words, the evidence would have allowed the jury to convict on second degree animal cruelty but acquit on first degree animal cruelty. Therefore, we conclude that Leatherman would have been entitled to an inferior degree instruction if defense counsel had requested one.

b. Conceivable Legitimate Tactic

The fact that Leatherman was entitled to an inferior defense instruction does not resolve the ineffective assistance of counsel issue because defense counsel may decide as a tactical matter to forgo such an instruction. *See Grier*, 171 Wn.2d at 42. "The salient question here is

not whether [the defendant] is entitled to such instructions but, rather, whether defense counsel was ineffective in foregoing such instructions." *Id.*

Leatherman relies on *State v. Smith*, 154 Wn. App. 272, 223 P.3d 1262 (2009). In that case, this court held that defense counsel's failure to request an instruction on second degree animal cruelty when the defendant was charged with first degree animal cruelty constituted ineffective assistance of counsel. *Id.* at 278-79. The court stated,

> [D]efense counsel's all or nothing strategy was not a legitimate trial tactic and constituted deficient performance because he presented evidence to call into question the State's theory on starvation, not the entire crime. This left the jury in an arduous position: to either convict Smith of first degree animal cruelty or to let him go free despite evidence of some culpable behavior.

*Id.* at 278. For support the court cited *State v. Pittman*, 134 Wn. App. 376, 387-89, 166 P.3d 720 (2006). *Smith*, 154 Wn. App. at 278-79.

However, the Supreme Court's subsequent analysis in *Grier* of ineffective assistance of counsel in the context of defense counsel's failure to propose a lesser included defense instruction is inconsistent with this court's conclusion in *Smith*. In *Grier*, the court questioned the holdings in several cases, expressly including *Smith* and *Pittman*, that defense counsel was ineffective for failing to propose a lesser included defense instruction. *Grier*, 171 Wn.2d at 37.

Deciding to forego an inferior degree offense or lesser included offense instruction reflects an "all or nothing" strategy. *See State v. Breitung,* 173 Wn.2d 393, 398-99, 267 P.3d 1012 (2011). The court in *Grier* emphasized the subjective nature of the decision to pursue such a strategy. 171 Wn.2d at 39. The court stated,

> A defendant who opts to forgo instructions on lesser included offenses certainly has more to lose if the all or nothing strategy backfires, but she also has more to gain if the strategy results in acquittal. Even where the risk is enormous and the chance of acquittal is minimal, it is the defendant's prerogative to take this gamble, provided her attorney believes there is support for the decision. Just as a criminal defendant with slim chances of prevailing at trial may reject a plea bargain nevertheless, a

criminal defendant who genuinely believes she is innocent may prefer to avoid a compromise verdict, even when the odds are stacked against her. Thus, assuming that defense counsel has consulted with the client in pursuing an all or nothing approach, *a court should not second-guess that course of action*, even where, by the court's analysis, the level of risk is excessive and a more conservative approach would be more prudent.

*Id.* (emphasis added).[2]

Turning to the facts of the case, the court in *Grier* noted that to rebut the strong presumption that defense counsel's performance was reasonable, a defendant claiming ineffective assistance of counsel "bears the burden of establishing the absence of any 'conceivable legitimate tactic explaining counsel's performance.' " *Id.* at 42 (quoting *Reichenbach*, 153 Wn.2d at 130). The court stated, "Although risky, an all or nothing approach was at least conceivably a legitimate strategy to secure an acquittal." *Grier*, 171 Wn.2d at 42.

The court emphasized that the defendant presented two theories that she was not guilty of the charged crime and that "acquittal was a real possibility, albeit a remote one." *Id.* at 42-43. The court concluded that the defendant and defense counsel "reasonably could have believed that an all or nothing strategy was the best approach to achieve an outright acquittal." *Id.* at 43. The court also stated, "That this strategy ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance analysis." *Id.* Therefore, the court concluded that the defendant could not prove deficient performance. *Id.*

The Supreme Court reached the same result in *Breitung*, 173 Wn.2d at 399-401. In that case, the defendant was charged with second degree assault and the issue was whether defense

---

[2] The court in *Grier* assumed that defense counsel had consulted with the defendant in deciding whether to propose a lesser included offense instruction. In *Breitung*, the Supreme Court stated that consultation should be presumed absent evidence of a failure to consult. 173 Wn.2d at 401.

counsel should have proposed an instruction on fourth degree assault. *Id.* at 397. The court

noted that the defendant's theory was that no assault occurred at all. *Id.* at 399. The court

concluded, " 'Where a lesser included offense instruction would weaken the defendant's claim of

innocence, the failure to request a lesser included offense instruction is a reasonable strategy.' "

*Id.* at 399-400 (quoting *State v. Hassan*, 151 Wn. App. 209, 220, 211 P.3d 441 (2009)).

*Grier* and *Breitung* are more applicable here than *Smith*. Leatherman provided testimony

from multiple witnesses that he took good care of Wolfy. They testified that Wolfy looked

normal to them when they had seen him last, that Leatherman left bowls of food out for Wolfy,

and that Leatherman loved Wolfy. In closing, Leatherman argued that the State had not

presented evidence that his care of Wolfy was deficient and that it was not reasonable to require

an ordinary person to engage in the type of grooming habits the State argued was required. As a

result, as in *Grier*, acquittal was a real possibility. And as in *Breitung*, Leatherman essentially

claimed innocence. Therefore, not proposing a second degree animal cruelty instruction "was at

least conceivably a legitimate strategy to secure an acquittal." *Grier*, 171 Wn.2d at 42.[3]

Accordingly, we hold that defense counsel's failure to request an inferior degree offense

instruction did not constitute ineffective assistance of counsel.

### 3. Failure to Object to Evidence of Other Health Problems

Leatherman also argues that his defense counsel provided ineffective assistance by failing

to object to evidence of Wolfy's many health problems not directly related to starvation.

Leatherman contends that this evidence was not relevant to the State's theory that his failure to

---

[3] In addition, the court in *Grier* suggested that a defendant could not show prejudice in this situation because it must be assumed that the jury would not convict on the higher degree offense if the State did not meet its burden of proof. 171 Wn.2d at 43-44. Therefore, the availability of a "compromise verdict" allowed by the inferior degree instruction would not have changed the outcome. *Id.* at 44.

address Wolfy's periodontal disease caused Wolfy to starve, and therefore it was inadmissible under ER 404(b). We disagree.

Under ER 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Leatherman claims that defense counsel's failure to object to evidence of Wolfy's skin, ear, and joint problems allowed the jury to find him guilty based on his failure to seek treatment for Wolfy's more obvious health problems.

"The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). We presume that "the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). The decision not to object may be a legitimate trial tactic where defense counsel does not want to risk emphasizing unfavorable testimony. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004).

In order to show that defense counsel was ineffective for failing to make a particular objection, the defendant must show that (1) failure to object fell below "prevailing professional norms," (2) the proposed objection would likely have been sustained, and (3) the result of the trial would have differed had the objection been made. *Id*.

Here, the State presented testimony from Dr. Smith regarding her necropsy of Wolfy that did not directly relate to his inability to eat, his starvation, and his related pain. She identified extensive hair loss and alopecia (a skin condition). She also found arthritis, old gunshot wounds, and severe chronic ear infections.

However, the evidence presented here of Wolfy's many health conditions was not offered to prove Leatherman's character but to demonstrate how a dog in Wolfy's condition could starve despite the fact that dog food was available to him. Evidence that Wolfy was in chronic pain due to his skin and orthopedic conditions as well as his ear infections suggested that he chewed on himself to relieve his discomfort. When he chewed on himself, hair wrapped around his teeth. Over time, the hair cut into his gum line and exacerbated his periodontal disease, compounding his inability to eat dog food and contributing to his emaciation. This evidence was relevant to the State's theory, and defense counsel was not ineffective for choosing to avoid calling additional attention to the evidence with an objection. Further, because the evidence was relevant the trial court likely would not have sustained an objection to that evidence.

Accordingly, we hold that defense counsel's failure to object to this evidence did not constitute ineffective assistance.

B.      PROSECUTORIAL MISCONDUCT

Leatherman argues that the prosecutor engaged in misconduct during closing argument and rebuttal by improperly (1) mischaracterizing the term "reasonable doubt" and (2) encouraging the jury to convict him if they found he had not cared for Wolfy as a reasonable person would care for a human child. We disagree regarding first argument, and conclude that Leatherman waived the second argument by not objecting at trial.

1.      Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). In assessing whether a prosecutor's closing argument

was improper, we recognize that the prosecutor has "wide latitude to argue reasonable inferences from the evidence." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). To establish prejudice, the defendant must show a substantial likelihood that the misconduct affected the jury verdict. *Id.* at 442-43. When analyzing prejudice, we do not look at the alleged improper remarks "in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

When the defendant failed to object at trial, the defendant is deemed to have waived any error "unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). The defendant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Id.* at 761.

2. Characterization of Reasonable Doubt

Leatherman argues that the prosecutor's closing remarks on reasonable doubt undermined the presumption of innocence and improperly shifted the burden of proof to the defense. We disagree.

"Shifting the burden of proof to the defendant is improper argument, and ignoring this prohibition amounts to flagrant and ill intentioned misconduct." *Glasmann*, 175 Wn.2d at 713. A prosecutor commits misconduct by suggesting that the defendant can be presumed guilty or that the State somehow does not bear the burden of proving its case beyond a reasonable doubt. *Emery*, 174 Wn.2d at 759-60. "Misstating the basis on which a jury can acquit [the defendant]

13

insidiously shifts the requirement that the State prove the defendant's guilt beyond a reasonable doubt." *Glasmann*, 175 Wn.2d at 713.

Here, the prosecutor stated in closing argument

When you go back and you deliberate, you will be given the definition of the term "reasonable doubt." And what a reasonable doubt means, it's a very circuitous definition, "it's one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence."

What does that mean? In a nutshell, it means when you go back and you deliberate and you say, well, I have a doubt in this case. Before you say "not guilty," you have to ask yourself, is the doubt that you have a reasonable one? If the answer is, no, it's not reasonable, then that's not a reasonable doubt.

2 RP at 326-27.

In *Emery*, the prosecutor stated "[I]n order for you to find the defendant not guilty, . . . you'd have to say, quote, I doubt the defendant is guilty, and my reason is blank. A doubt for which a reason exists. If you think that you have a doubt, you must fill in that blank." 174 Wn.2d at 750-51 (alteration in original). The Supreme Court held these comments improperly shifted the burden of proof because they started with the phrase "in order for you to find the defendant not guilty," which was a "bad beginning because a jury need do nothing to find a defendant not guilty." *Id.* at 759-60. And although the prosecutor properly defined reasonable doubt as a "doubt for which a reason exists," the argument improperly implied that the jury must be able to articulate the nature of its reasonable doubt by filling in a blank. *Id.* at 760.

Here, the prosecutor began by accurately describing reasonable doubt as a doubt "for which a reason exists." 2 RP at 326. The prosecutor went on to state that if the jury found they had doubt in the case, "*[b]efore* you say 'not guilty,' you have to ask yourself, is the doubt that you have a reasonable one?" 2 RP at 326-27 (emphasis added). However, unlike the prosecutor

14

in *Emery*, the prosecutor here did not tell the jury that they had to "fill in the blank" with an *articulable* reasonable doubt, but reiterated that a doubt about the defendant's guilt that is not reasonable does not meet the definition of reasonable doubt. The prosecutor concluded closing remarks by arguing that "the State has proved beyond a reasonable doubt that Mr. Leatherman is guilty," recalling to the jury that it was the State's burden to prove Leatherman's guilt, not Leatherman's burden to prove his innocence. 2 RP at 327.

We hold that the prosecutor's statements regarding reasonable doubt did not improperly shift the burden of proof to Leatherman. Leatherman's prosecutorial misconduct claim based on this statement fails.

      3.    Comparing Wolfy to a Human Child

Leatherman argues that the prosecutor's comparison between the care a reasonable person would give a child and the care Leatherman gave Wolfy was improper and prejudiced him at trial. We agree that the prosecutor's statements were improper, but we hold that Leatherman waived his prosecutorial misconduct claim because he did not object to this argument at trial.

During closing argument, defense counsel discussed the "obvious camaraderie and affection" that Leatherman had for Wolfy and argued that this relationship made it unlikely that Leatherman would engage in conduct that would cause Wolfy to starve. 2 RP at 329. In rebuttal, the prosecutor stated:

> Let's talk about what a reasonable person would do. Reasonable person would brush their teeth. Reasonable person would make sure, if they have kids, they would brush their kid's teeth, if their kid couldn't do it themselves. Reasonable person would make sure they would eat. Reasonable person would make sure, if they had kids, their kids were eating.

2 RP at 345-46. Later, the prosecutor stated:

15

> Ladies and gentleman of the jury, can you imagine if you had a kid. You can say all day long, I love my kid. I would do everything I possibly can for my kid. I put food out on the table for my kid, but if your kid had periodontal disease in their teeth, if your kid had so many unhealthy teeth conditions that it was making it difficult for your kid to eat, then I submit to you the fact that you say, I love my kid, and the fact that you put food out for your kid but the fact you don't do anything else for your kid, don't brush your kid's teeth, don't take your kid to the doctor to make sure your kid is healthy, don't solve the problems thats [*sic*] causing your kid to starve, that still makes you a neglectful parent, and this is the same situation.

2 RP at 354. Leatherman did not object to this argument at trial.

A prosecutor has wide latitude to argue reasonable inferences from the evidence and is entitled to fairly respond to defense's counsel's arguments and criticisms of the State's case. *Thorgerson*, 172 Wn.2d at 448, 449-50. However, a prosecutor may not make arguments designed to inflame the jury's passion or prejudice. *Glasmann*, 175 Wn.2d at 704.

Here, the prosecutor seemingly equated the standard of care for a reasonable parent and a reasonable dog owner by stating that if a parent did not "solve the problems [that are] causing [a] kid to starve, that still makes you a neglectful parent, and *this is the same situation*." 2 RP at 354 (emphasis added). This argument was improper because it had the potential to inflame the jury's passion and prejudice because the idea of a child experiencing the same kind of disease and injury that Wolfy did would have been highly distressing, even more so than the idea of an elderly dog experiencing it.

However, Leatherman did not object to the prosecutor's argument at trial. If he had objected, the trial court could have cured any prejudice by directing the jury to disregard the prosecutor's statement and to rely on its own assessment of whether Leatherman's behavior with respect to Wolfy met the definition of criminal negligence. The prosecutor's statements were not so inflammatory that an instruction would have been ineffective. Accordingly, we hold that Leatherman waived his prosecutorial misconduct claim based on these statements.

C.     UNPRESERVED CHALLENGE TO BAIL JUMPING TO-CONVICT INSTRUCTION

For the first time on appeal, Leatherman argues that the to-convict instruction for bail jumping erroneously relieved the State of its burden to prove that he failed to appear in court "as required" in violation of his right to due process.  We decline to address this argument because, under this court's decision in *State v. Hart*, 195 Wn. App. 449, 381 P.3d 142 (2016), *review denied*, 187 Wn.2d 1011 (2017), the challenge to the to-convict instruction does not involve a manifest constitutional error under RAP 2.5(a)(3).

Leatherman did not object to the to-convict instruction at trial.  Generally, we will not consider an issue raised for the first time on appeal unless the party claiming the error can show that an exception applies.  RAP 2.5(a); *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011).  One exception is for a "manifest error affecting a constitutional right."  RAP 2.5(a)(3). In order to raise an issue for the first time on appeal under RAP 2.5(a)(3), the appellant must demonstrate that (1) the error is truly of a constitutional dimension, and (2) the error is manifest. *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015).

RCW 9A.76.170(1) states that a person is guilty of bail jumping if the person is released by court order "with knowledge of the requirement of a subsequent personal appearance before any court" and "fails to appear . . . *as required*."  (Emphasis added.)  Here, the bail jumping to-convict instruction was modeled on 11A *Washington Practice: Washington Pattern Jury Instructions: Criminal* 120.41 (4th ed. 2016).  Two of the instruction's elements were that Leatherman "failed to appear before a court" and that he "had been released by court order or admitted to bail with knowledge of the requirement of a subsequent personal appearance before that court."  CP at 45.  The instruction did not provide that the State had the burden to prove that

Leatherman failed to appear in court "as required," which is the language used in RCW 9A.76.170(1).

In *Hart*, this court addressed an argument identical to the one Leatherman makes here: that the to-convict instruction relieved the State of its burden to prove that he had failed to appear at a court hearing "as required." 195 Wn. App. at 455. The trial court's to-convict instruction (identical to the instruction given here) did not include "as required" after "the defendant failed to appear before a court." *Id.* at 456. But the instruction required the State to prove beyond a reasonable doubt that the defendant "had been released by court order or admitted to bail with knowledge of the requirement of a subsequent personal appearance before that court." *Id.* The court held that the instruction did not violate the defendant's due process rights because the instruction included the element of a required subsequent appearance. *Id.*

Leatherman contends that *Hart* was wrongly decided because its reasoning conflates two different elements of bail jumping. But we agree with the analysis in *Hart*.

As a result, Leatherman's challenge to the to-convict instruction is not a manifest constitutional error because this court already has determined that identical language satisfies due process. Accordingly, we decline to review Leatherman's challenge.

D.      IMPOSITION OF CRIMINAL FILING FEE

Leatherman argues that under the 2018 amendments to RCW 36.18.020(2)(h), we must strike the criminal filing fee imposed on him because he was indigent. The State does not oppose striking this fee.

The trial court imposed as a mandatory LFO a $200 criminal filing fee. In 2018, the legislature amended RCW 36.18.020(2)(h), which now prohibits imposition of the criminal filing fee on an defendant who is indigent as defined in RCW 10.101.010(3)(a)-(c). The Supreme

Court in *State v. Ramirez* held that amendments to the LFO statutes apply prospectively to cases pending on direct appeal. 191 Wn.2d 732, 749-50, 426 P.3d 714 (2018).

At Leatherman's sentencing, the trial court approved an order of indigency for Leatherman to appeal his case at public expense. As the State notes, the record is unclear if the trial court found Leatherman indigent based on the definitions in RCW 10.101.010(3)(a)-(c). But given the trial court's finding that Leatherman was indigent for purposes of appeal, the State does not oppose vacation of the criminal filing fee. Accordingly, we remand for the trial court to strike the criminal filing fee from the judgment and sentence.

CONCLUSION

We affirm Leatherman's conviction for first degree animal cruelty and bail jumping, but we remand for the trial court to strike the criminal filing fee from the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, C.J.

We concur:

_____
MELNICK, J.

_____
SUTTON, J.